FILED/REC'D NOV 16 P 11:21 CLERK OF COURT U.S. DISTRICT COURT WD OF WI

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JOSEPH MAXIM HOWDEN,
Plaintiff,

v.

BRETT HERMANSON and MITCHELL PETERSON, in their individual capacities;

GREEN COUNTY, WISCONSIN; and

CODY KANABLE, Sheriff of Green County, in his official capacity only, in the alternative,
Defendants.

COMPLAINT
JURY TRIAL DEMANDED

Case No. **26-cv-1137-jdp**

---

## NATURE OF THE ACTION

1. On July 6, 2021, before any deputy had spoken to Plaintiff, a Green County sheriff's deputy told Plaintiff's mother and sister that, since Plaintiff lived at the residence, the deputies "just can't go up and say, hey, you're ... kicked out": "there has to be court process with that to get him evicted and that takes a while." In the short term, he said, "we have to go to domestic route," and Plaintiff "would be arrested and he would be held without bond because you say you guys are in fear of him." Two deputies decided that Plaintiff would be arrested before either of them had spoken to him. One of them wrote that he decided, on what Plaintiff's mother and sister had said, to hold Plaintiff in custody without bond. Under the statewide bail schedule, a person arrested for misdemeanor disorderly conduct was to be released on posting $150 unless a court had set bail otherwise; on information and belief, no court had set bail for Plaintiff. Plaintiff brings this action under 42 U.S.C. § 1983 for that night in jail

without bail and for the seizure at his door and the arrest. He seeks damages from the deputies for those wrongs and from Green County for the policies, practices, failures or decisions that caused them. He reserves the claims that arise from the prosecution and from the bar from his home that followed. (Paragraph 48)

## JURISDICTION AND VENUE

2. This action arises under the Fourth and Fourteenth Amendments to the United States Constitution and under 42 U.S.C. § 1983. The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3). Venue is proper in this District under 28 U.S.C. § 1391(b)(2). The events giving rise to the claims took place in Green County, Wisconsin, which is in this District.

## PARTIES

3. Plaintiff Joseph Maxim Howden is an adult. He lived in Green County, Wisconsin, on July 6, 2021, and he lives there now.

4. Defendants Brett Hermanson and Mitchell Peterson were deputies of the Green County Sheriff's Office on July 6 and 7, 2021. Each acted under color of state law and within the scope of his employment, and each is sued in his individual capacity. On information and belief, their business address is the Green County Sheriff's Office, 2827 6th Street, Monroe, Wisconsin 53566.

5. Defendant Green County is a Wisconsin county; the Sheriff's Office is its law-enforcement agency, and the Green County Jail is its jail. The County's address is the office of the Green County Clerk, Green County Courthouse, 1016 16th Avenue, Monroe, Wisconsin 53566.

6. Defendant Cody Kanable has been the Sheriff of Green County since 2024. He is sued in his official capacity only, in the alternative to the claims

against Green County, as Counts II and V state. His business address is the Green County Sheriff's Office, 2827 6th Street, Monroe, Wisconsin 53566. On July 6, 2021, he was a sergeant in the Sheriff's Office; he came to the residence after the arrest, and his body camera recorded there.

## FACTS

### A. Plaintiff's sister called dispatch and described a non-emergency

7. On July 6, 2021, Plaintiff's only home was a house in Green County, on a largely wooded property of roughly 160 acres, where his mother also lived. The house stands at the end of a driveway from County Road H. Deputy Peterson's report records his mother's statement that this was Plaintiff's only residence and that he had no other place to go. Where this complaint states what someone other than Plaintiff said, or what a report or a recording has someone other than Plaintiff say, Plaintiff states what was said and does not adopt it.

8. That evening his mother and his sister left the house, and his sister called dispatch. Plaintiff has listened to the recording. She called it "a non-emergency case for a request for an officer." Asked whether Plaintiff was currently causing an issue, she answered, "He was." She said, "No physical or anything, but there's a lot of verbal yelling." Asked whether he had access to weapons, she answered, "No, he does not." She said that his mother "does feel threatened in the house" and that she herself "didn't feel safe." She spoke of a possible mental health crisis and of undiagnosed anger, and she asked for an officer to "talk with us about some options." She described no threatening words or act and no physical contact, and she did not ask that Plaintiff be arrested.

B. At the park, before any contact with Plaintiff, a deputy spoke of arresting and holding him

9. Defendants Peterson and Hermanson met his mother and his sister (the callers) and a third person at a state park. Deputy Peterson arrived first, and Deputy Hermanson arrived while he was speaking with them. The deputies' body cameras recorded at the park; the earliest recording began at 8:01 p.m. Plaintiff was not at the park and had no notice of the call.

10. At about 8:07 p.m., before any deputy had spoken to Plaintiff, a deputy, on Deputy Peterson's body camera, told the callers that, since Plaintiff lived at the residence, the deputies "just can't go up and say, hey, you're ... kicked out": "there has to be court process with that to get him evicted and that takes a while." In the short term, he said, "we have to go to domestic route since he's resided with you as adults." He said that a domestic "would be pretty much based off of the disorderly conduct that happened this morning from what you guys are telling me," and that Plaintiff "would be arrested and he would be held without bond because you say you guys are in fear of him and so he'd sit in jail until he sees the judge the next day." He described a 72-hour no-contact period "[e]nforced from the time of the arrest." At about 8:10 p.m. a deputy called the matter "a simple disorderly conduct," and said, "the domestic is an enhancer. It's attached to it." At about 8:13 p.m. a deputy spoke of "the optional 72 hour no contact" and said that it "kind of gives you time to get your affairs in order with getting an eviction."

11. In the passages of the park recordings that Plaintiff has listened to, a deputy, at about 8:14 p.m., asked whether anything physical had occurred and was the first to use the word "physical." His mother answered, "He has not hit me or anything," and said, in substance, that he had scared her so that she stepped back from him. A deputy then asked, "Has he made an action as he was

going to hit you or push you or anything?" She answered, "He's approached me when we've been outside and I just stepped back." Asked whether he had swung at her, she answered, "No." At about 8:15 p.m., on the park recordings, a deputy asked his mother, "Were you fearful he was going to hit you or anything at that time when he's walking up on you?" The word "fearful" was the deputy's. She said that he had been "screaming at the guys at the end of the road," the utility workers, "and I don't know if they could hear him or not, because there's traffic and it's a long driveway, a lot of trees and stuff." She said, "he started kind of towards me and I didn't know if he was just wound up or if he was physically gonna get me." She said, "So I honestly can't say he's ever hit me or anything like that." The word "screaming" is hers. Plaintiff does not adopt it. (Paragraph 7) She did not say that the workers heard him, and she named no threat and no physical act that day beyond his walking toward her. Walking toward a person, without more, is not a physical act of the kind Wis. Stat. § 968.075(1)(a)4. requires, and it is not a crime. (Paragraph 38) Stepping back from a person who walks up does not make the approach such an act, or a crime. A third person, who had been present for neither of the exchanges the callers described, joined in her account and added to it.

12. At about 8:23 p.m. his mother said, "I guess what I'm afraid of is if I'm too dead to tell the tale, you know." She said, in substance, that the only firearm was an old small-game rifle kept in a locked gun case in the attic, and then: "So I think I can say we don't have weapons in the house. We have kitchen knives, you know. It's something I think about." She went on to speak, in substance, of the look in his eyes and of how angry he was. Those words state a fear and an impression and name no act or words of Plaintiff's. At about 8:24 p.m., in the deputies' conversation with each other, it was said, in substance, that Plaintiff had mental issues and had said that the utility company's box was

listening to his conversations. Plaintiff did not say that the utility equipment at the end of the driveway was spying on him. Deputy Peterson's report has his mother state that Plaintiff believed that the utility equipment was spying on him. The report is false so far as it suggests that he said so. A deputy then said that "it sounds like at most we have," in substance, a disorderly conduct. A deputy said, in substance, that if the callers wanted an arrest, the only option "other than her going to spend the night somewhere" was for the deputies to arrest him, and added, "I asked her that and she didn't say yes or no to it." At about 8:25 p.m. a deputy said, in substance, that it was her "being fearful when he was walking up on her," fearful, on information and belief, that he was going to hit her, "so we got the domestic." She herself had said that she did not know "if he was just wound up," and that she could not say that he had ever hit her. (Paragraph 11) At about 8:27 p.m. his mother said that she was afraid of what Plaintiff might do while she was gone, "like would he burn the house down while I'm gone?" Asked whether he had ever done anything of the kind, she answered, "No, no, no." She said, in substance, that she was rattled and afraid because of what he had done that day. What she had described of that day was his voice, raised at the utility workers, and his walking toward her. No caller had reported a diagnosis. The deputies did not take Plaintiff into custody for care; they decided to arrest him for disorderly conduct.

13. As the reports give the callers' accounts, his mother placed her encounter with Plaintiff at about 3:00 p.m., and his sister's exchange with him followed her own arrival at about 6:30 p.m. By the same accounts, the callers had then left the property, and the reports describe no pursuit. Deputy Hermanson's report states that there had been no physical contact. In his mother's account, Deputy Peterson's report describes an approach it calls "aggressive," in which she described Plaintiff as "sprung," "tensed up," and having "a look in his eye."

It places her fear "after the incident," as a fear "that Joseph would do more than just yell," words that describe what had happened as yelling. "Aggressive," "sprung," "tensed up" and "a look in his eye" are impressions. Beyond the approach itself, the report names no physical act and no word of threat behind them, and it does not say how close he came. At the park she described his walking toward her and her stepping back. (Paragraph 11) Plaintiff does not adopt the report's account of the afternoon. (Paragraph 7) The report is false so far as it has him approach her aggressively or make a physical movement toward her beyond walking.

14. The report has his sister say that, in his room, he kept repeating a profane word and told her he "didn't care and that the police would have to bring everybody to get him," and that she felt threatened. A profane word is not by itself a threat or a crime; it is speech, and the First Amendment bars punishing it for its content alone. No recording captures the exchange in Plaintiff's room. At the park, on Deputy Peterson's body camera at about 8:03 p.m., she had given Deputy Peterson her own account: she had told Plaintiff, in substance, that if he kept on, someone would eventually call the police, and he answered, "call them call them bring the whole city out here so they can know what's going on." The words she gave at the park are not the report's: they ask that the police be called "so they can know what's going on," and they say nothing of not caring or of the police having to come "to get him." Neither account describes a threat. She also said that he had called them idiots, and an insult is not a threat. Plaintiff never said that he did not care and that the police would have to bring everybody to get him, in those words or in words to that effect. The report's attribution of that statement to him is false.

15. At about 8:31 p.m., his mother said, "This time was the worst, most unhinged I've seen him." She said, "I'm totally happy to press charges this time,"

and that she wanted him to get help and treatment. Her words name no act. At about 8:07 p.m., before she said any of this, a deputy had told the callers that Plaintiff would be arrested and held without bond. (Paragraph 10) At about 8:32 p.m., a deputy told the callers that if Plaintiff were arrested that night, the help his mother wanted would not come "until months down the road most likely." He said: "it sounds like you need him out of the house. So you need him out of the house, so you need to either pursue the eviction or the restraining order," and "it sounds like that would be your best bet." About two minutes later a deputy said that the deputies would not be there the next day. It was then said, "If this is what you guys want to do, I'm recommending," then "take care of it tonight," and "we would ... go over and arrest him for disorderly conduct." The recommendation to arrest him that night was the deputy's.

16. Deputy Peterson's report states the hold at the end of its probable-cause section, which rests on the callers' statements and comes before any account of contact with Plaintiff: "Based off of this I decided to hold Joseph in custody without bond." The sentence before it gives his mother's fear of Plaintiff's presence, not any act of his. On information and belief, the hold was decided at the park, when no deputy had seen or spoken to Plaintiff that night or observed his physical condition or his fitness to care for his own safety.

17. At the park the deputies obtained his mother's permission to enter the house. Deputy Peterson's report gives it this way: "Prior to departing [his mother], I asked if we had permission to enter her house. [His mother] stated 'yes'." At about 8:36 p.m., asked how they would get Plaintiff outside to talk to him, a deputy said, "Well if you give us permission we can enter the home." It was said, "I think he'll come out and talk to you," and, "he seems like he might yell, but he's willing to have a conversation." A deputy spoke of telephoning him to meet them outside. Offered the permission later by telephone, a deputy

answered, "We get permission right here. We will use that." A deputy told his mother, "It has to come directly from you. You're the owner of the house." She had told the deputies that she had given Plaintiff permission to live there. His mother then said, in substance, that she hoped the deputies would credit what his sister had seen if Plaintiff tried to "jive" them. A deputy answered, "No, if we're going over there with this option, ma'am, we already have probable cause to arrest." No deputy had yet spoken to Plaintiff. Whether there was probable cause turns on what the deputies knew, not on what a deputy said he had. The words show that the deputies had decided to arrest him before they heard from him.

C. <u>The deputies entered the enclosed porch and the house without a warrant</u>

18. The deputies reached the house at about 8:46 p.m. They had no warrant. Deputy Hermanson's report states that Deputy Peterson tried to reach Plaintiff by telephone, without success. Within about a minute of reaching the house, the deputies went in through the door of an enclosed porch built onto the side of the house (the "enclosed porch"; Deputy Peterson's report calls it the "breezeway"), and from it into the house. The enclosed porch is built onto Plaintiff's house and opens directly into its interior. Its exterior door opens onto wooden steps that run down beside the wall of the house to a concrete walk. Inside the house, from about 8:47 to 8:48 p.m., a deputy called out "Sheriff's office!" and "Green County Sheriff's Office!", called Plaintiff's first name, and said, "Just want to talk to you for a second. Just want to make sure you're okay." At about 8:49 p.m., a deputy reported on the radio, "We've made entry into the residence trying to locate the male subject." Deputy Hermanson's report gives the purpose as "to locate Joseph." Plaintiff was then out on the property walking

the dog. (Paragraph 19) On the recordings the calls end at about 8:48 p.m., before he came back into view. Neither deputy's report describes an emergency. Deputy Peterson had been at the park for more than forty minutes. Nothing the deputies knew gave reason to believe that anyone needed immediate help. The offense reported, disorderly conduct, is a Class B misdemeanor.

19. His mother was not there. Plaintiff was out walking the dog on the property, and his phone was in the house. Plaintiff returned at about dusk, when it was nearly dark. The deputies' body-camera video shows them going through the rooms of the house with flashlights from about 8:47 to 8:49 p.m. He came back into view of the deputies' cameras, walking up to the house, less than three minutes after they had gone in. He saw flashlight beams moving through the house, and his first thought was that the house was being burglarized. He was not sure that the persons inside were law enforcement officers until after they had handcuffed him.

D. <u>Plaintiff told the deputies to leave, and they seized him on the porch steps</u>

20. The body-camera audio captures Plaintiff telling the persons inside, at low conversational volume, that they could not "trespass like that," and to "step out of the house." When he said these words, the deputies were still inside the enclosed porch, one of them in its doorway, and he was outside it. At about 8:49:46 p.m., on both deputies' body cameras, a deputy told him, "Your mother gave us permission." At about 8:49:52 p.m., on both cameras, Plaintiff said, "I live here." Deputy Hermanson's report records that Plaintiff "stated we were trespassing and needed to leave," and Deputy Peterson's that he stated the deputies "were trespassing in his residence." The deputies' own reports record that he was "calm at this point," and that after he was told of the permission he

"seemed to calm down a little bit." Plaintiff did not consent to the deputies' entry or to their remaining in his home after he told them to leave.

21. Plaintiff stood just outside the door, at the top of its steps (the "porch steps"), beside the wall of his house and to the side of the doorway, far enough out of their way that they could have walked past him. In both reports the deputies first asked Plaintiff to step down. Deputy Hermanson's report reads, "Deputy Peterson asked Joseph to step down from the stair," and Deputy Peterson's reads, "I asked Joseph to step off the stairs and to walk onto the sidewalk." Both reports record that Plaintiff wanted the deputies to step down first. The reports also have a deputy command him, in Deputy Hermanson's words "Joseph was told again to go" and in Deputy Peterson's "I then told Joseph to step off of the staircase and to walk out onto the sidewalk." The deputies' body cameras record what was said. On Deputy Peterson's, at about 8:49:49 p.m., a deputy asked, "Can you step down here for me?" and Plaintiff asked, "Can you step down first?" On Deputy Hermanson's, at about 8:49:51 p.m., a deputy answered, "No, go ahead for us, Max." On Deputy Peterson's, at about 8:49:55 p.m., a deputy asked, "Max, can you please just walk down for me?" Both deputies' body cameras record Plaintiff's answer at about 8:49:56 p.m.: "No." He gave it once, quietly and politely. The deputies' words were requests, not commands. Plaintiff asked the deputies to step off the porch first, and said that he would then do the same, because he was not sure that the persons who had just come out of his house were deputies. Before they took hold of him, no deputy told Plaintiff that he was detained or under arrest, and no deputy identified himself to him by name or agency.

22. Deputy Peterson's report states that Plaintiff "then became agitated and began yelling" before the deputies took hold of him. It gives none of his words, and Deputy Hermanson's report records no yelling then. On the body-

camera video, in the two seconds before the first deputy's hand reached him, Plaintiff stood still beside the doorway with his hands low. Deputy Peterson's statement that Plaintiff began yelling before the deputies took hold of him is false.

23. By both reports, Deputy Peterson took hold of Plaintiff's right arm and Deputy Hermanson took hold of his left. They took him down the steps and handcuffed him. At about 8:50 p.m., on the body-camera recordings, after the deputies had taken hold of him, a deputy said, "You weren't listening very well," and a deputy then told him, in substance, not to fight. Plaintiff answered, "I'm not fighting anything." A deputy answered, in substance, that he was fighting. Neither report describes a struggle. Deputy Peterson's report says that, once the deputies held his arms, Plaintiff "tensed up and began yelling even louder," and that at the bottom of the stairs he "continued to tense up"; the same report says that when the deputy began to walk down the stairs, Plaintiff "willingly started moving." The report's "even louder" assumes yelling before the deputies took hold of him, which did not happen. (Paragraph 22) On the body-camera video, Deputy Peterson's hand is on Plaintiff's wrist and forearm before Plaintiff's right hand rises, open; the frames show no fist, no reach toward either deputy and no step toward either of them. Plaintiff raised his hand, as if to ask what they were doing; he did not raise it at them. He was not fighting, and he did not resist. Declining a request is not resisting, and it is not a crime. (Paragraph 21) Deputy Peterson's report has Plaintiff "yelling over me" at the bottom of the stairs, after the deputies had taken hold of him, and gives that as the point at which he was handcuffed "for his safety and ours." Deputy Hermanson's report has Plaintiff, once handcuffed, "yell over" Deputy Peterson "and not let him talk." In the passages of Deputy Peterson's body-camera recording that Plaintiff has listened to, he did not yell as he was placed in

handcuffs at about 8:50 p.m.; he spoke at ordinary conversational volume. From about 8:51 to 8:52 p.m., while he stood handcuffed beside the house and spoke of the speeding traffic on County Road H, he again spoke at a conversational level. Deputy Peterson's report is false so far as it has him yelling as the deputies handcuffed him, and both reports are false so far as they have him yell over Deputy Peterson while he stood handcuffed beside the house. Only after he was handcuffed, at about 8:53 p.m., was he told that he was under arrest for disorderly conduct, for an incident earlier that day with his mother. Asked what specifically, a deputy answered, in substance, that he had been yelling in his bedroom.

E. After the arrest, a deputy told the callers he wanted "better details"

24. At the vehicles, at about 8:56 p.m., on Sergeant Kanable's and Deputy Hermanson's body cameras, Plaintiff said that "if I'm getting in any trouble," then "she's getting arrested for child abuse." In the transport he asked the deputies, in substance, to act on the abuse in his family that he was reporting, as they had acted on the word of two people against him. Those words threatened no harm by him to anyone. Deputy Hermanson drove Plaintiff to the Green County Jail. His report has Plaintiff say during the drive that the system was broken because he was going to jail for shouting at his mother. On the recording made in the car, Plaintiff asked, in disbelief, whether yelling was what he was being arrested for; he was not describing his own conduct that day. Later on the same recording, he said in effect that the system was broken. He did not say that the system was broken because he was going to jail for shouting at his mother. The report's attribution is false.

25. At about 8:59 p.m., on Sergeant Kanable's and Deputy Peterson's body cameras, a deputy, on information and belief Deputy Peterson, said, in

substance, that it was going to be "domestic," and that "if you're in fear of going home," Plaintiff was going to "have to get arrested anyways." Plaintiff does not recall hearing those words on July 6, 2021, and he does not believe that he did. He first heard them on the recording in 2026. In the call to dispatch his sister asked for help and options, not for an arrest. (Paragraph 8) The recommendation to arrest him that night was the deputy's. (Paragraph 15) On Sergeant Kanable's recording, at about 9:00 p.m., the words "without bond" are followed by the question "Are you going to?" and the answer "Yeah." On information and belief, Sergeant Kanable asked Deputy Peterson whether he was going to hold Plaintiff without bond, and Deputy Peterson answered that he was.

26. At about 9:07 p.m. Deputy Peterson told the callers, "Based off of what I got there, I had enough information," in substance, of probable cause to make an arrest, and, "I just want better details. That's all it is." At about 9:19 p.m., his sister spoke of text messages Plaintiff had sent her after the callers had left. She said, "I wouldn't say they're like threats," and called the messages, in substance, emotional abuse. At about 9:22 p.m., asked whether any of the messages should be printed out, a deputy, on information and belief Deputy Peterson, answered that he "didn't see anything there" that "would escalate to any charges or anything like that." After the callers left, Plaintiff had sent them text messages and called them, and asked whether they were all right; neither responded. From about 9:38 p.m. Deputy Peterson questioned the callers with a notepad. On information and belief, the words "tensed up," the time of his sister's exchange and the profane word in the reports were first given to the deputies then. On information and belief, in that interview the words "threatened," "agitated" and "profanities" were first spoken by the deputy, in his questions. A profane word is not by itself a threat or a crime. The time of his mother's exchange was also given after the arrest. In that interview his mother

said that Plaintiff was "so agitated that it frightened me." She said that he "was loud, very boisterous." She said that she stepped back toward the car and was shaking, and, in the passage Plaintiff has listened to, in answer to a word the third person suggested, that he was intimidating. She named no physical act that day beyond his walking toward her. His sister said: "I felt threatened. He never came at me or swung at me or anything like that, but the way he just kept getting closer and kind of like bigger and yelling louder and everything, so I was just, I'm gonna go." She said that the exchange was short and in his own room. The deputy put it to her that Plaintiff "became boisterous with you" and had used profanities, and she answered, in substance, that he was "telling me to fuck off." She said, "he didn't follow me." Coming closer while speaking, in one's own room, is not a physical act of the kind Wis. Stat. § 968.075(1)(a)4. requires. Nor is a profane word by itself a threat or a crime. At about 9:48 p.m., a deputy asked his sister whether she had ever lived with Plaintiff as an adult. She answered no. At the park a deputy had said that the deputies had "to go to domestic route since he's resided with you as adults." (Paragraph 10) As to his sister, that stated premise was untrue. Plaintiff does not adopt the callers' accounts. (Paragraph 7)

27. At about 9:25 p.m., on his body camera, Deputy Peterson read his mother the 72-hour no-contact notice, which speaks of "the 72 hours following the domestic abuse arrest of" Plaintiff. At about 9:35 p.m., on the same recording, a deputy, on information and belief Deputy Peterson, advised the callers to "get that TRO right away because then he can't come back," and said that "that 72 hours is" going to "buy you some time." As at the park, the arrest and the 72 hours were described as the means of keeping Plaintiff out of his home while civil process ran. (Paragraphs 10 and 15)

F. The deputies kept Plaintiff in jail overnight without bond

28. Deputy Hermanson's report gives his number as 27, and Deputy Peterson's gives his as 16. On information and belief, 27 was Deputy Hermanson's number on the radio; on his own body-camera recording, a voice that Plaintiff recognizes as Deputy Hermanson's gives the number "27" on the radio. Deputy Peterson's body camera made a recording at the residence after the arrest. About twenty-three minutes into that recording, a deputy who gives his number on the radio as "16" tells dispatch that he does not have any "additional charges." Two to three minutes later, a radio exchange takes up whether Plaintiff was to be held without bond. At about 9:33 p.m., on Deputy Hermanson's body camera, a voice on the radio says that the only other thing the speaker needs to know is whether "he still wants" a person held without bond. Eleven seconds later, a voice says that "27 just needs to know if you want him held without bond." The answer was to "hold without bond." On information and belief, Deputy Peterson gave that answer. No reason was given. On information and belief, no judge and no court commissioner took part in that exchange or in the decision.

29. At the Jail, at about 9:44 p.m., on Deputy Hermanson's body camera and a jail camera, an officer told Plaintiff, "you're staying in jail tonight." The officer also told him, in substance, that disorderly conduct was what he was arrested for and staying in jail for. At about 9:51 p.m., on Deputy Hermanson's and Sergeant Kanable's body cameras, an officer told him that he was staying "because of the statements your mom made." Deputy Hermanson's report states that he "advised him he would be staying in jail for the night." On information and belief, his body camera records him telling jail staff, at about 9:23 p.m., in substance, that the charge was disorderly conduct and that they would probably

be holding Plaintiff without bond. Plaintiff does not recall anyone at the Jail, on the night of July 6, 2021, offering to release him on bail or naming a bail amount. On information and belief, no court had set bail for him. Plaintiff does not recall anyone telling him, on the night of July 6, 2021, when he would be released. The next morning someone told him that he would be released soon, and he was released some hours later.

30. Deputy Hermanson's report states that the release paperwork was left in the jail office, to be finished with Plaintiff "tomorrow." It states that he "told Joseph there was paperwork to go through, and asked if he would go through it." It states that Plaintiff "must acknowledge and sign the Condition of Release before being released from jail." It gives "continuous threats," not any refusal to sign or to answer questions, as the reason Plaintiff was held without bond, and it does not say that he refused to sign. Plaintiff does not recall being handed any paper about bail or about release at the Jail that night, and he does not believe that he was. He does not recall being asked to sign the Condition of Release at the Jail that night, and he does not recall refusing to sign any paper. As Plaintiff recalls it, the next morning, shortly before he was released, he probably had to sign something. The report says that, when told of a written statement form, Plaintiff "did not acknowledge this." On a jail camera recording, at about 9:46 p.m., Plaintiff was asked, "Do you want to give a written statement?" When the question was repeated, at about 9:47 p.m., Plaintiff answered, "Yes." The report does not record that answer. No formal statement was ever taken.

31. At about 10:33 p.m., on a jail recording, an officer told Plaintiff, "if you don't cooperate with us, you're not going to get into court tomorrow." The officer said that he had not been booked in: "You didn't get your fingerprints taken, your photo taken. You didn't answer any of our questions." Plaintiff answered, in substance, that they had him there on false charges. The officer said,

"I'm not the one that arrested you," and then, "A judge or a lawyer won't see you until you cooperate with us." The officer said, in substance, that they would take care of it when Plaintiff let them know that he was ready to be booked in. A few minutes later, at about 10:39 p.m., on a second jail recording, Plaintiff said, "I want a lawyer. I want legal assistance." On information and belief, the hold had been decided at the park, before anyone asked Plaintiff a question; it had been confirmed on the radio about an hour before the officer spoke, and the report gives "continuous threats," not any refusal to be booked or to answer questions, as its reason. The officer's words made Plaintiff's access to a judge and to a lawyer depend on a booking after the hold had already been decided.

32. On information and belief, no officer formed or wrote the opinion described in Wis. Stat. § 969.07: that Plaintiff was not in a fit condition to care for his own safety or would constitute, because of his physical condition, a danger to the safety of others. At the vehicles, at about 8:59 p.m., on Sergeant Kanable's and Deputy Peterson's body cameras, someone asked whether Plaintiff had been drinking, and a voice answered that it "smelled like it a little bit." A deputy then asked Plaintiff whether he drank alcohol. He answered, "Occasionally, not tonight," and, "100% sober, don't worry." At the Jail, at about 9:39 p.m., on Deputy Hermanson's body camera, a deputy, on information and belief Deputy Hermanson, said, "He's just crazy. He ain't on anything," and, "I didn't smell nothing on him." A remark that a person is "crazy" is an insult. It is not the opinion that § 969.07 describes, which concerns the person's fitness to care for his own safety or the danger that his physical condition poses to others. No officer said that Plaintiff was under the influence of anything. Plaintiff spent the night of July 6 to 7, 2021, in the Green County Jail.

33. At the Jail, at about 9:33 p.m., Plaintiff said to the jail officers there, "you motherfuckers are going to lose your jobs." He swore at them in frustration

at what was being done to him. Those words said that the jail officers would lose their jobs; they did not say that Plaintiff would do anything to them, and they said nothing about violence. None of the counts rests on them. Nor did the hold follow from them. At about 9:00 p.m., on information and belief, Deputy Peterson had answered "Yeah" when asked whether he was going to hold Plaintiff without bond, and at about 9:23 p.m., on information and belief, Deputy Hermanson had told jail staff that they would probably be holding Plaintiff without bond. (Paragraphs 25 and 29) The radio question at about 9:33 p.m. asked whether "he still wants" a person held without bond, and it gave no new reason. (Paragraph 28) A profane word is not by itself a threat or a crime. On information and belief, the hold had been decided at the park about an hour earlier, and, on information and belief, Deputy Peterson, who gave the radio answer (Paragraph 28), was then at the residence and did not hear those words.

G. <u>The deputies' reports state conclusions, quote no threat and leave out parts of what the caller said</u>

34. The deputies' reports were incorporated in the criminal complaint filed on July 7, 2021. Deputy Hermanson wrote that Plaintiff's mother "advised there had been no physical contact, but Joseph had made a physical movement that made her reasonably believe physical abuse would occur," and that "there was probable cause to arrest Joseph for disorderly conduct under the domestic abuse statute." The "physical movement" in that sentence is a conclusion. Neither report says what the movement was, and Deputy Peterson's probable-cause section names no physical act. At the park she said that he "has not hit me or anything." (Paragraph 11) The reports are false so far as they have him make any physical movement toward her beyond walking.

35. Deputy Hermanson wrote that Plaintiff was held without bond "[d]ue to continuous threats towards" his mother. Deputy Peterson wrote that Plaintiff "used profanity that threatened both" his mother and his sister. Each statement is a conclusion that names no words and no act, and the reports quote no words of Plaintiff threatening anyone. At about 9:42 p.m., on Deputy Peterson's body camera, asked whether Plaintiff was using any profanities, one of the callers answered, "Not to me." A profane word is not by itself a threat or a crime. On the jail recordings that Plaintiff has listened to from start to end, and on the passages of the recordings of the arrest at the house and the drive to the jail that he has listened to, no one says that Plaintiff has threatened anyone, and Plaintiff is not heard threatening anyone with harm. Plaintiff threatened no one with harm on July 6 or 7, 2021. The reason Deputy Hermanson gave for the hold is false, and Deputy Peterson's statement is false in saying that Plaintiff threatened his mother or his sister.

36. The reports' summary of the call to dispatch leaves out that the caller called it a non-emergency, leaves out her words "No physical or anything" from the sentence quoted whole in paragraph 8, and leaves out her answer "No, he does not" on weapons. The reason given for the hold appears in four forms: at the park, the callers' fear; in Deputy Peterson's report, the callers' statements; at the Jail, in substance, the statements his mother had made; and in Deputy Hermanson's report, "continuous threats." None of these reasons is a ground that Wis. Stat. § 969.07 names.

37. On July 7, 2021, at his first appearance by video, which began at 1:33 p.m., a judicial officer set a signature bond of $750. The docket records no finding of probable cause. Deputy Peterson's report states that he "completed a Probable Cause Statement and Judicial Determination," which "was then signed and notarized and handed over to jail staff." The report does not say that any

judge or court commissioner signed it, and no such paper appears on the docket. To his memory, Plaintiff has not seen that paper, and he does not adopt any date, time or signature that may appear on it. On information and belief, it was on the court's form CR-215, which has a box for an officer to state that a judge or court commissioner determined probable cause by telephone and instructed him to affix the decision, the signature, the date and the time, "to be countersigned later by the judge/commissioner." The paper alone may therefore not show when a judge or court commissioner acted. No hearing was held, then or at any later time, on whether the deputies had probable cause to arrest or hold Plaintiff. The 72-hour no-contact period, which the deputies applied to him, and then the bond conditions barred Plaintiff from his home. The bond barred contact with the callers "or residences." After the 72 hours, it let him go to the residence, his home, "one time to pick up personal belongings if accompanied by an officer." The docket states the same condition when the bond was reinstated on June 23 and September 6, 2022, and records a change to "No violent or abusive or disorderly contact" on October 27, 2025.

## THE STATEWIDE SCHEDULE SET BAIL FOR DISORDERLY CONDUCT AT $150

38. The Uniform Misdemeanor Bail Schedule adopted by order of the Wisconsin Supreme Court dated November 19, 2020, set cash bail for disorderly conduct at $150. Its preamble lists grounds, among them an apparent danger of harm to another person and a need for further detention to carry out legitimate investigative action, on which a person arrested for a misdemeanor need not be released without a cash bond. A person not released on those grounds "shall be released upon compliance with the ... misdemeanor bail schedule unless bail is otherwise set by the court." None of those grounds permits a hold without bail.

Wis. Stat. § 969.07 states that it "does not require the release of a defendant from custody when an officer is of the opinion" described in paragraph 32, and it names no other exception. The schedule's preamble adds that its guidelines "do not supersede specific statutorily mandated detention." Wis. Stat. § 968.075(2m) mandates detention only after an arrest that § 968.075(2) required for domestic abuse, and then only "until the person posts bail under s. 969.07 or appears before a judge under s. 970.01 (1)." It did not bar release on the scheduled bail. Walking toward a person, without more, is not "[a] physical act that may cause the other person reasonably to fear imminent engagement in" the conduct that § 968.075(1)(a) lists. Wis. Stat. § 968.075(3)(a) (intro.) required each law enforcement agency to adopt written domestic-abuse policies, including "[a] policy reflecting the requirements of subs. (2) and (2m)," § 968.075(3)(a)1.b. No statute or bail schedule required the Sheriff to refuse bail to Plaintiff. On information and belief, no court rule or order of any court required it, and no court had set bail for him other than by the schedule. (Paragraphs 29 and 41)

<u>THIS ACTION DOES NOT CHALLENGE THE CRIMINAL JUDGMENT</u>

39. On November 17, 2021, Plaintiff entered a plea of no contest to one count of disorderly conduct under a deferred judgment agreement, and the circuit court stayed entry of a judgment of conviction. On June 25, 2026, it entered judgment on that plea. His postconviction motion, filed October 16, 2026, is pending. This action does not ask the Court to set aside that judgment and does not depend on its invalidity. It does not ask the Court to decide whether any of Plaintiff's conduct on July 6, 2021, was disorderly. No element of Wis. Stat. § 947.01(1) concerns an arrest or what an officer knew, and neither the plea nor the judgment decided whether the deputies had probable cause when they took hold of him. A conviction under § 947.01(1) does not require a finding that the

defendant threatened anyone, and the judgment, entered on a plea of no contest, does not establish that Plaintiff threatened anyone. The criminal complaint charged two counts of disorderly conduct, and neither count refers to domestic abuse or to Wis. Stat. § 968.075. The two counts were worded alike, and neither the criminal complaint nor the judgment says what conduct the count of his plea concerned. The claims concern what the defendant deputies knew, decided and said on July 6 and 7, 2021. Plaintiff pleads what he said and did on those days, and what the recordings show of it, to show where the deputies were and what they knew and did. No count depends on what Plaintiff said, or how loudly, after the deputies took hold of him. No count is conditioned on any allegation that the Court may find incompatible with the judgment while it stands. Nothing in this complaint concedes any fact or changes any position in the criminal case.

## THE CLAIMS ARE TIMELY, AND THE DEPUTIES ARE ESTOPPED FROM ARGUING OTHERWISE

### A. The claims against Green County began to run no earlier than February 11, 2026

40. Plaintiff was told that he was under arrest for disorderly conduct, for an incident earlier that day with his mother, and, in substance, that he was staying in jail because of the statements his mother had made. (Paragraphs 23 and 29) A deputy had spoken of the hold as part of the "domestic route" at the park, out of Plaintiff's presence. (Paragraph 10) The recording of those words first reached Plaintiff on February 11, 2026. (Paragraph 43) To his memory, before that day he did not know that a deputy had spoken there of a hold without bond before any deputy spoke to him, that the deputies had spoken there of his arrest as following from the callers' fear, or that a deputy had told his mother there, "It

has to come directly from you. You're the owner of the house." To his memory, no one told him before February 2026 that a deputy had spoken at the park of "the optional 72 hour no contact" as giving the callers time "with getting an eviction." (Paragraphs 10, 17 and 44) Before that day he had also seen no written policy or rule of the Sheriff's Office or the Jail on holding persons arrested in domestic cases. Plaintiff does not recall being told, before February 11, 2026, of any rule or practice of the Sheriff's Office or the Jail on arresting and holding people in domestic cases, and he does not believe that he was.

41. In letters dated October 16, 2026, Plaintiff asked the Sheriff for the written policy that Wis. Stat. § 968.075(3)(a) required, the Jail's bail and release rules and the yearly numbers of persons booked on a domestic abuse arrest and of those released on bail before a first court appearance. Those letters came back from the Postal Service undelivered, and Plaintiff mailed the requests again in November 2026. The Sheriff had not produced the records when this complaint was filed. Whether or not a copy of the reports reached Plaintiff (Paragraph 44), a report tells what a deputy did, not what rule of the County produced it, and the written account gave the hold as Deputy Peterson's own decision: he "decided to hold Joseph in custody without bond." (Paragraphs 16 and 42) The words that point to a County course of proceeding, the "domestic route" and a hold without bond described before any deputy had spoken to Plaintiff, were spoken at the park and left out of that account. (Paragraphs 10 and 42) Plaintiff first had reason to know, no earlier than February 11, 2026, that County action caused the hold, the seizure at his door, the arrest, the 72-hour no-contact period or the bond's residence term, and his claims against Green County did not begin to run before that day. In the alternative, and for limitations purposes only, if any period had run against Green County before that day, Green County is estopped from relying on it for the reasons that paragraphs 42 to 47 state, because what those

paragraphs describe was done by deputies of the Green County Sheriff's Office acting within the scope of their employment. (Paragraph 4) This alternative does not make Green County liable as the deputies' employer.

B. Defendants Hermanson and Peterson are estopped from relying on the statute of limitations

42. Plaintiff knew on July 6, 2021, that deputies had seized him and that he was being held. What stayed hidden from him was what the deputies said at the park, which the recordings show. Out of his presence, a deputy told the callers, before any deputy had spoken to Plaintiff, that Plaintiff would be arrested and held, and gave the callers' fear as the reason. A deputy spoke there of the "domestic route" and of court process to evict him, and recommended the arrest that night. In the passages of the park recordings that Plaintiff has listened to, a deputy first used the word "physical." (Paragraphs 10, 11 and 15) Counts I and IV turn on what the deputies knew, decided and said. Counts I to V sue on the hold, the seizure at the door and the arrest, not on the deputies' written account. That account, incorporated in the criminal complaint, does not say that a deputy told the callers Plaintiff would be held without bond, gave their fear as the reason, spoke of the "domestic route" or of court process to evict him, recommended the arrest that night, or first used the word "physical." It says that Deputy Peterson told them he "had charges to arrest Joseph," and that he "decided to hold Joseph in custody without bond." (Paragraph 16) It says that his mother said yes when a deputy asked for her permission, not that she had told the deputies she had given Plaintiff permission to live there. It also leaves out the parts of the call to dispatch stated in paragraph 36. The account gives his mother as the source of the "physical movement" and gives "continuous threats" as the reason for the hold, and those statements are false so far as paragraphs 34 and 35

state. The first attributes to her a word that, in those passages, a deputy had introduced. The second differs from the reason a deputy gave at the park, the callers' fear, before any contact with Plaintiff. (Paragraphs 10, 11, 15, 17, 34 and 35) Each report mentions the deputy's own cameras. Neither says what any camera recorded, or that anything recorded at the park differed from the reports' account. On information and belief, Deputy Peterson, who spoke at the park, knew what had been said there; Deputy Hermanson, who was also there (Paragraph 9), knew what had been said in his presence; each left those matters out of his report deliberately; and neither ever corrected the written account. This belief rests on each deputy's having been at the park, on the words being the deputies' own, and on each report's setting out what the callers said while leaving those words out. Plaintiff believes that discovery will support it.

43. No one gave, showed, or played any of the recordings to Plaintiff before February 11, 2026. On that day the lawyer then representing Plaintiff in the criminal case withdrew and, at a hearing, handed him two discs and a flash drive. The flash drive holds an export, created by the Sheriff's Office's evidence system on December 30, 2025, of the Office's recordings of July 6, 2021. One of the discs holds the call to dispatch. The export's audit log places Deputy Peterson's park recording in a category called "Investigation," with a retention period of 120 days, and shows Deputy Hermanson's body-camera recording of the park as "Uncategorized," with a retention period of "Unknown." The export holds no in-car recording from squad 367, which Deputy Peterson's report says he was operating. The log records three events linked to his body-camera recordings as purged, one on November 7, 2021, ten days before the plea, and two on March 6, 2022, the criminal case pending on each date. On information and belief, they were recordings from the in-car system of squad 367. The log does not say what they held, names no user and does not say why they were

purged, and Plaintiff does not allege why. To his memory, no one told him before February 2026 that those events had existed or had been purged.

44. A deputy told Plaintiff at the door, "Your mother gave us permission." (Paragraph 20) A deputy told him at the arrest that he was under arrest for disorderly conduct, for an incident earlier that day with his mother, and, asked what specifically, answered, in substance, that he had been yelling in his bedroom. (Paragraph 23) On the jail recordings, an officer told him that he was staying "because of the statements your mom made." (Paragraph 29) At about 9:44 p.m., on the jail recordings, a deputy, on information and belief Deputy Hermanson, told him, in substance, that a deputy had interviewed the callers and that the deputies had determined that there was probable cause to arrest him for disorderly conduct. Those words said nothing of the park. On what the deputies had told him, Plaintiff understood that he had been arrested and held because of what his mother and his sister had reported. That night, to his memory, he did not know what his sister had told the dispatcher, and he knew of what the callers had told the deputies only what this paragraph states. To his memory, nothing he saw or heard that night told him that any part of the reasons he was given had come from what the deputies themselves had said at the park rather than from the callers. To his memory, no deputy named a threat or a physical movement to him as the reason. To his memory, no one told him before February 2026 anything the deputies said at the park, or that they had decided there, as on information and belief they had, before any deputy spoke to him, to arrest him and hold him without bond. To his memory, he did not know until February 2026 that a deputy had written "continuous threats" or a "physical movement." The docket of the criminal case records that Plaintiff was "given complaint" at his first appearance on July 7, 2021. Plaintiff does not recall being handed a copy, and he does not recall reading the criminal complaint

before his plea. The first time he recalls reading it and the deputies' reports incorporated in it was in February 2026, from a copy he had asked for himself. The written account was the account on which the criminal case proceeded, and before February 11, 2026, to his memory, nothing in the proceedings told Plaintiff that it differed from what had been said at the park.

45. At the Jail that night Plaintiff asked for a lawyer and legal assistance. (Paragraph 31) On information and belief, the lawyer appointed for him on August 3, 2021, was in private practice, and the appointment was for the criminal case only and did not include any civil claim. The circuit court's record shows that lawyer's appearance ending on November 17, 2021, the day of the plea, and no lawyer appearing for Plaintiff in the criminal case from then until December 26, 2025. Whether or not a copy of any recording reached that lawyer, none reached Plaintiff through that lawyer, who did not show him or review with him the body-camera recordings or the recording of the call to dispatch, and did not tell him what the caller had said on it. Paragraph 47 rests on what the deputies did and on what Plaintiff was told, not on anything that lawyer did or did not do. On February 20, 2026, the court appointed another lawyer, who remained counsel of record until the court granted his motion to withdraw on May 1, 2026. Since then Plaintiff has represented himself in the criminal case.

46. By May 7, 2026, Plaintiff had listened to the body-camera audio of the arrest and the minutes immediately around it. While preparing his postconviction motion without a lawyer, he listened to passages of the two park recordings, of the recording of the deputies' interview with his mother and sister at the residence and of the recording of the drive, and to three jail recordings from start to end. He first heard the park recordings in October 2026, and he files this action in November 2026, about a month later.

47. Plaintiff did not sue Defendants Hermanson and Peterson before February 11, 2026, because he relied on the account he was given that night of why he was arrested and held, including what a deputy told him at the arrest and what a deputy, on information and belief Deputy Hermanson, told him at about 9:44 p.m. of the interview with the callers. (Paragraphs 23 and 44) That account pointed to his mother and, to his memory, said nothing of what the deputies themselves had said and decided at the park. (Paragraphs 42 and 44) Parts of what the criminal complaint alleged were mentioned to him at various points, but, to his memory, not that a deputy had written "continuous threats" or a "physical movement," and no one went through the criminal complaint with him line by line before February 2026. (Paragraph 44) His reliance rests on what he was told that night, which, like the written account, pointed to his mother; it does not depend on his having read that account. Whether or not a copy reached him, the written account was the account on which the criminal case proceeded and left in place the understanding that paragraph 44 states, and the recordings first reached him on February 11, 2026. (Paragraphs 42, 43 and 44) When he said at the Jail, in substance, that he was held on false charges, he disputed the reason he had been given, the callers' report. His words showed no knowledge of what the deputies themselves had said and decided at the park. (Paragraphs 31 and 44) As to the entry, the deputy's words at the door, "Your mother gave us permission," and the written account's "stated 'yes'" presented the entry as his mother's decision. The door words did not say that a deputy had proposed the entry to her at the park, and neither phrase said why the deputy had asked for it or that a deputy had said there that evicting Plaintiff required court process. (Paragraphs 10, 17, 20 and 44) For limitations purposes only, the seizure at the door and the arrest are one seizure, and Counts III and IV give two reasons that seizure was unreasonable. Paragraphs 42 to 47 apply to that seizure on either

ground. As to the hold, paragraph 44 states what, to his memory, he was not told of the park, and, to his memory, nothing he was told said that a voice on the radio had asked whether "he still wants" a person held without bond. (Paragraphs 10, 15, 27, 28, 44 and 51) Count I rests in part on what the hold was for (Paragraphs 50 to 52), and the reason he was given at the Jail, the statements his mother had made, did not disclose it. (Paragraph 29) Because of the deputies' conduct, any period on which they could rely began no earlier than February 11, 2026, when the recordings first reached Plaintiff, and this action was filed within it. In the alternative, he acted promptly: a complaint against named officers had to rest on what the recordings show, the recordings had to be listened to before it could be written, he first heard the park passages in October 2026, and for most of the time since February 11, 2026, he has had no lawyer. (Paragraphs 43, 45 and 46) Defendants Hermanson and Peterson are therefore equitably estopped from relying on any statute of limitations, under federal law and, in the alternative, under Wisconsin law. Plaintiff does not concede that any period has run.

C. <u>Plaintiff reserves the prosecution claims and the claims on the bar from his home</u>

48. Plaintiff does not sue in this complaint on the prosecution or on the bar from his home. He reserves those claims, and paragraphs 68 to 73 state their facts. First, he reserves the claims for malicious prosecution under the Fourth Amendment and for the fabrication of evidence under the Fourteenth, against Defendants Hermanson and Peterson and, in the alternative, against Green County for its policy, practice or failure. Those claims depend on how the criminal case ends, and he contends that they reach the bar from his home for as long as it lasted, through October 27, 2025. (Paragraph 37) Second, he reserves the claims that arise from the 72-hour no-contact period and from the bond

conditions, against the same Defendants and in the same alternative. So far as those claims do not depend on how the criminal case ends, he will ask leave to add them before any judgment in this action. Third, he reserves any claim that the arrest, the hold or the prosecution punished speech that the First Amendment protects (Paragraph 14), and claims under Wisconsin law that arise from the same events. As to the Wisconsin claims that do not depend on how the criminal case ends, he will present the notice and claim that Wisconsin law requires and will ask leave to add them when it allows. He will ask leave to add each reserved claim in this action: by supplemental pleading under Fed. R. Civ. P. 15(d) if it depends on how the criminal case ends, and otherwise by amendment under Fed. R. Civ. P. 15(a)(2). Nothing in this paragraph concedes when any of them accrued or that any period of limitations has run. Nothing in this complaint waives them.

## CLAIMS

## COUNT I

THE DEPUTIES HELD PLAINTIFF IN JAIL OVERNIGHT WITHOUT BOND TO KEEP HIM OUT OF HIS HOME; NO STEP OF THE ARREST OR NEED OF THE COURT CALLED FOR IT, AND, ON INFORMATION AND BELIEF, NO JUDGE OR COURT COMMISSIONER TOOK PART AND NO COURT HAD SET BAIL.

42 U.S.C. § 1983; Fourth Amendment, applied to the States by the Fourteenth.
Against Defendants Hermanson and Peterson.

49. Plaintiff repeats paragraphs 1 to 48. This Count challenges Plaintiff's custody after the arrest, until the circuit court set bond on July 7, 2021. It does not depend on whether the deputies had probable cause to arrest him, or on any violation of state law. Each deputy took part personally. Deputy Peterson

wrote that he decided the hold. On information and belief, he decided it at the park before any deputy had spoken to Plaintiff, he was the deputy who spoke of it to the callers there, and he gave the radio answer "hold without bond." (Paragraphs 10, 16, 25 and 28) Deputy Hermanson wrote its reason, carried it out at the Jail, and, on information and belief, did not offer Plaintiff release on the scheduled bail. In the alternative, on information and belief, he knew that Plaintiff was held for no reason connected with the arrest or with his appearance in court, had a realistic opportunity to see that Plaintiff was offered that release, and did not. (Paragraphs 9, 10, 24, 28, 29, 30 and 35)

50. No step of the arrest explains the hold. The night in jail was not time needed to book Plaintiff, to transport him or to bring him before a judge. On information and belief, the hold was decided at the park, before any of those steps had begun, and it was confirmed on the radio at about 9:33 p.m. (Paragraphs 16 and 28) At about 10:33 p.m. he had not been booked in, but the officer spoke of booking as the condition of seeing a judge or a lawyer, not of release. (Paragraphs 30 and 31) Nor was the hold time needed to investigate. At about 9:07 p.m. Deputy Peterson said, "Based off of what I got there, I had enough information," in substance, of probable cause to make an arrest, and, "I just want better details. That's all it is." What followed was questioning of the callers, which did not need Plaintiff in custody, and questions to Plaintiff at the Jail, among them whether he wanted to give a written statement; he said yes, and no formal statement was taken. None of the reasons given for the hold is a need to investigate. (Paragraphs 26, 30, 31 and 36) Custody was also not the only way to bring Plaintiff to court. The statewide schedule set bail of $150, and, on information and belief, no court had set bail and no officer held the opinion described in Wis. Stat. § 969.07. If Wis. Stat. § 968.075(5)(b)1. and (6) applied to his arrest, release also required the acknowledgment and the agreement those

subsections describe, and Plaintiff does not recall being presented with either that night. (Paragraphs 29, 30, 32 and 38) Had bail of $150 been offered to him, he believes that he would have been able to post it. At his first appearance a judicial officer set a signature bond of $750. (Paragraph 37)

51. The words recorded at the park state what the hold was for. At about 8:07 p.m., before any deputy had spoken to Plaintiff, a deputy told the callers that the deputies could not put Plaintiff out of the house: "there has to be court process with that to get him evicted and that takes a while." In the short term, he said, "we have to go to domestic route," and Plaintiff "would be arrested and he would be held without bond because you say you guys are in fear of him and so he'd sit in jail until he sees the judge the next day." (Paragraph 10) A deputy later said, "it sounds like you need him out of the house. So you need him out of the house, so you need to either pursue the eviction or the restraining order." (Paragraph 15) After the arrest, a deputy told the callers to "get that TRO right away because then he can't come back." (Paragraph 27) As the deputies described them, the arrest, the hold until court and the 72-hour period were the short-term answer to what, a deputy said, only court process could bring in the long term: Plaintiff out of the house. As a deputy described it, the 72-hour period ran from the arrest. (Paragraph 10) The night in jail was a separate step, taken, on information and belief, without any court, toward the same end. In the words at the park, the next day's court date was when the hold would end, not the reason for it. None of the four forms of the reason given for the hold identifies any threat or physical act of Plaintiff's, and the last, "continuous threats," written afterwards, is not the reason given at the park or at the Jail. (Paragraphs 16 and 34 to 36)

52. A decision by an officer alone to keep a person in jail until court because others fear him, or to keep him out of his home, is a decision about

pretrial detention, not a step of an arrest. The deputies made and carried out that decision, as paragraph 49 states, for a purpose unrelated to any step of the arrest or to bringing Plaintiff to court: to keep him out of the house. Whenever it was made, on information and belief no judge or court commissioner took part in it. If a judge or court commissioner signed the paper described in paragraph 37, that signature did not make the decision to hold him, which, on information and belief, had already been made. If that paper sets bail or orders him held, this Count covers the hours before that was done. On information and belief, any finding of probable cause on that paper rested on Deputy Peterson's written statement alone. Whether or not that purpose was well meant, the hold was an unreasonable seizure under the Fourth Amendment. The callers' fear gave no reason for the night in custody. As a deputy described it, the 72-hour no-contact period was "[e]nforced from the time of the arrest," and, as the deputies applied it, it required Plaintiff to avoid the residence whether or not he was released on the scheduled bail. (Paragraphs 10 and 69) In the alternative, if the hold served no purpose at all, it was delay for delay's sake: a night in custody added nothing to the 72-hour period. (Paragraph 10) This claim would stand even if state law allowed everything the deputies did. Plaintiff pleads state law only as evidence that no rule required the hold, that no court directed it, and that custody was not the only way to bring him to court. If the Sheriff's policy or practice provided for release, the deputies acted contrary to it; if it provided for the hold, it is pleaded against Green County in Count II, in the alternative. Defendants acted under color of state law and with reckless disregard of Plaintiff's rights. Plaintiff lost his liberty for the night and was distraught at having been handcuffed and jailed, an injury in itself, whether or not that night was later credited against a sentence. No damages are sought for the judgment or sentence.

## COUNT II

THE HOLD WAS CAUSED BY GREEN COUNTY'S POLICY, PRACTICE, FAILURE OR DECISION, AND THE COUNTY IS LIABLE FOR IT.

42 U.S.C. § 1983; Fourth Amendment, applied to the States by the Fourteenth. Against Green County; in the alternative, against Defendant Kanable in his official capacity.

53. Plaintiff repeats paragraphs 1 to 52. On information and belief, the Sheriff's written policy and the Jail's practice governed who at the Jail offered the scheduled bail, who could refuse it, and on whose word. The duty to adopt the written policy in paragraph 38 falls on each law enforcement agency and is not peculiar to the office of sheriff. In setting the written policy and the practice on taking the scheduled bail, the Sheriff acted as the final policymaker for Green County and not for the State: he is chosen by the electors of the county, Wis. Const. art. VI, § 4(1)(b). This Count challenges the hold without the scheduled bail, and the taking of bail is a function the law gives to no one office. Subject to paragraphs 59 and 67, the Sheriff's Office is a department of Green County, and on information and belief the County pays its deputies and jail officers and a committee of the County Board oversees its budget. The policy, practice and failure pleaded in paragraphs 55 to 58 are those of that department and of the County, whether or not the Sheriff acts for the State in any other part of his office.

54. The County caused the hold in one or more of four ways, each in force on July 6 and 7, 2021, and pleaded in the alternative on the facts in paragraphs 10, 16, 25, 28, 32 and 41. The first three, so far as the Sheriff set them, were also his decisions as final policymaker. (Paragraph 53) Wis. Stat. § 968.075(2m) did not require the hold. On the facts the deputies had, it did not apply (Paragraphs 11 and 38), and where it applies it leaves, apart from the exception it names, two ways out of custody, bail or a judge. The statewide

schedule set that bail at $150. (Paragraph 38) Each of the four ways closed off release on that bail.

55. The first way was a written policy. On information and belief, the Sheriff's domestic-abuse policy under Wis. Stat. § 968.075(3), or the Jail's written release procedure, or both, provided that a person arrested in a domestic case was not to be released on the scheduled bail before seeing a judge. In the alternative, on information and belief, that policy or procedure provided that the arresting deputy alone would decide, without review by a judge or court commissioner, whether such a person would be offered that bail. In the further alternative, on information and belief, it required the arrest of an adult who lived with persons who said they were in fear of him, and it barred release after every such arrest until the person appeared before a judge. On information and belief, under each of these forms the hold rested on the domestic label or the arresting deputy's word, not on any decision by a judge or court commissioner or any step of the arrest, and it served to keep the person away from the alleged victim and out of the residence overnight. (Paragraphs 10, 15 and 51) This claim does not depend on whether the policy complied with state law. It does not rest on the length of the hold alone or on a practice of bringing arrested persons before a judge within forty-eight hours. It rests on who decided the hold, on what ground and for what purpose.

56. The second way was a widespread practice. On information and belief, whatever the written policy said, the Sheriff's Office and the Jail in practice kept persons arrested in domestic cases in jail until court, on the domestic label or the arresting deputy's word, without a decision by any judge or court commissioner and without offering the scheduled bail, for the purpose a deputy described at the park. The deputy spoke of that course in the conditional, as what the "domestic route" would bring, before any deputy had spoken to Plaintiff: he

"would be arrested and he would be held without bond," and "he'd sit in jail until he sees the judge the next day." (Paragraph 10) This belief rests on the deputy's description of the hold at the park, on the radio exchange, and on the records in the Sheriff's control that he had not produced when this complaint was filed. (Paragraphs 10, 28 and 41)

57. The third way was a practice of leaving release to the arresting deputy's word. On information and belief, it was the settled practice of the Sheriff's Office and the Jail that the arresting deputy alone decided, without review by a judge or court commissioner, and with supervisors and jail officers acting on his word, whether a person arrested in a domestic case would be offered the scheduled bail. On information and belief, at about 9:00 p.m. Sergeant Kanable, now the Sheriff, asked Deputy Peterson whether he was going to hold Plaintiff without bond, and Deputy Peterson answered, "Yeah." On information and belief, no one overruled that answer, and Plaintiff was held on it. (Paragraphs 16, 25 and 28) The radio question at about 9:33 p.m. asked only what the arresting deputy wanted, and it asked for no reason. (Paragraph 28) The reason for the one hold then changed with the speaker: the callers' fear at the park, the callers' statements in Deputy Peterson's report, his mother's statements at the Jail, and "continuous threats" in Deputy Hermanson's report. (Paragraph 36) Had a rule required the arresting deputy to state a reason, the hold would have had one reason. On information and belief, no rule and no reviewer required the arresting deputy to state one. On information and belief, each practice pleaded in paragraphs 56 and 57 was so widespread and settled that it had the force of law, and the Sheriff and the officers of the Sheriff's Office responsible for its policies and standards knew of it or must have known of it, and took no step to end it. The County's policymakers were deliberately indifferent to its known or obvious consequence: overnight custody on an

officer's word, kept for whatever reason the officer chose, with no rule or reviewer requiring him to state one and no judge or court commissioner deciding, so that holds kept for purposes unrelated to the steps of the arrest or to bringing the person to court would occur and go unchecked.

58. The fourth way was a failure to adopt and teach the limits on keeping a person in custody after an arrest. On information and belief, as of July 6, 2021, the Sheriff's Office had adopted no written policy "reflecting the requirements of subs. (2) and (2m)" of § 968.075, although the statute had required one since 2006. In the alternative, on information and belief, it had not trained deputies and jail staff that an officer may not, on his own decision and with no judge or court commissioner taking part, keep an arrested person in custody overnight because others fear him, to keep him out of his home, or for any other purpose unrelated to the steps of the arrest or to bringing him to court. Arrests in domestic cases recur, and the question of release arises in every one. The need was obvious, the failure was deliberate indifference, and the hold of Plaintiff was its predictable consequence. This failure is pleaded as a custom and not as an act of final policymaking.

59. The policy, practice, failure or decision was the moving force behind the hold, which was an unreasonable seizure, and behind the injury that paragraph 52 states. Green County is liable for it. This claim began to run no earlier than February 11, 2026, and it does not depend on estoppel. (Paragraphs 40 and 41) If the Court holds that the policy, practice, failure or decision was the Sheriff's and not the County's, Plaintiff pleads this Count in the alternative against Defendant Kanable, the Sheriff of Green County, in his official capacity.

COUNT III

THE DEPUTIES SEIZED PLAINTIFF AT THE DOOR OF HIS HOME WITHOUT A WARRANT, CONSENT OR EMERGENCY.

42 U.S.C. § 1983; Fourth Amendment, applied to the States by the Fourteenth. Against Defendants Hermanson and Peterson.

60. Plaintiff repeats paragraphs 1 to 48. This Count and Count IV each state a ground of relief for the arrest, and each stands without the other. Without a warrant, on his mother's permission given at the park while he was away, both deputies entered Plaintiff's home. On information and belief, they went in to arrest him. They knew that he lived there and that he was an adult. (Paragraphs 10 and 17) When Plaintiff, a resident present at his own door, told them to leave while they were still inside the enclosed porch, her permission did not license them to remain there or at his door, and it was no consent to seize him. Plaintiff does not concede that her permission allowed the entry. On Deputy Hermanson's body camera, Deputy Peterson stood in the door frame of the enclosed porch until about 8:49:57 p.m., after Plaintiff had told them to leave, and then stepped out of it to Plaintiff. Both deputies then took hold of him at the top of the porch steps, which with the enclosed porch are part of his home and its curtilage. Deputy Hermanson's report says that the deputies "made contact with Joseph on the front porch." (Paragraphs 7 and 17 to 23)

61. There was no emergency, and the deputies had time to seek a warrant and did not. (Paragraphs 8, 13, 17 and 18) The seizure was unreasonable in violation of the Fourth Amendment. Each Defendant took part personally. In the alternative, each was present, had reason to know that the seizure was being made without a warrant, consent or emergency, had a realistic opportunity to prevent it, and did not. Defendants acted under color of state law and with reckless disregard of Plaintiff's rights. The seizure invaded Plaintiff's home and

took him from its door in handcuffs. This ground does not depend on whether the deputies had probable cause.

## COUNT IV

THE DEPUTIES ARRESTED PLAINTIFF WITHOUT PROBABLE CAUSE.

42 U.S.C. § 1983; Fourth Amendment, applied to the States by the Fourteenth. Against Defendants Hermanson and Peterson.

62. Plaintiff repeats paragraphs 1 to 48, 60 and 61. When the deputies took hold of him at his door, at about 8:50 p.m., they lacked probable cause to arrest Plaintiff for any offense. What they knew came from the call, from the callers at the park and from what they saw and heard at the door. Even taking the callers' accounts as the deputies heard them before they took hold of him, and without adopting them (Paragraph 7), those accounts of that day described earlier yelling and an approach, with no blow and no swing. His mother said that she did not know whether the utility workers could hear him. Neither the reports nor the passages of the park recordings that Plaintiff has listened to record the callers telling the deputies any words of Plaintiff threatening harm to his mother. In those passages a deputy, not his mother, first spoke of anything "physical." Nothing at the door supplied what the accounts lacked. The reports were written after the arrest and do not say which of these accounts the deputies had heard before they took hold of Plaintiff. What the deputies learned after they took hold of Plaintiff cannot supply probable cause for taking hold of him, and a judgment entered almost five years later, on a plea, does not show what they knew then. This Count turns on what the deputies knew when they took hold of him, and it stands whether or not any of Plaintiff's conduct on July 6, 2021, was disorderly. (Paragraphs 8 to 17, 20 to 22, 26 and 35)

63. The arrest was an unreasonable seizure in violation of the Fourth Amendment. Each deputy took part personally and acted under color of state law and with reckless disregard of Plaintiff's rights. Plaintiff was seized at his door, handcuffed, taken from his home, and jailed. The seizure and the handcuffing were an injury in themselves, apart from any time in custody, and he was distraught at them. He seeks compensatory and nominal damages for the arrest and, so far as the law allows, for the custody that followed until the circuit court set bond, and none in this Count for the judgment or the sentence. Counts I, II and III do not depend on this Count, and only the arrest branch of Count V does.

## COUNT V

### THE SEIZURE AT PLAINTIFF'S DOOR AND THE ARREST WERE CAUSED BY GREEN COUNTY'S POLICY, PRACTICE OR FAILURE, AND THE COUNTY IS LIABLE FOR THEM.

42 U.S.C. § 1983; Fourth Amendment, applied to the States by the Fourteenth. Against Green County; in the alternative, against Defendant Kanable in his official capacity.

64. Plaintiff repeats paragraphs 1 to 48, 53 and 60 to 63. This Count sues the County for its own policy, practice or failure, not as the deputies' employer. It is pleaded in addition to Counts III and IV and, where the facts may differ, in the alternative, Fed. R. Civ. P. 8(d)(2), (3): so far as the deputies acted on the County's rule or training, the County answers for it, and whether or not they acted on it, Counts III and IV state what they did. The policies, practices and training pleaded here were those of the Sheriff's Office, a department of Green County. (Paragraphs 38 and 53) Wis. Stat. § 968.075(3)(c) leaves each agency free to adopt policies that require arrests in more circumstances than § 968.075(2) sets out, so long as those policies do not conflict with the presumption in § 968.075(2)

(am). No statute withdrew these choices from the agency. So far as any of them was the Sheriff's to set, he set it for Green County.

65. The first branch of this Count concerns the seizure at the door. At the park a deputy said, "We get permission right here. We will use that," and a deputy told Plaintiff's mother, "It has to come directly from you. You're the owner of the house." (Paragraph 17) When Plaintiff objected at his door, a deputy told him, "Your mother gave us permission." (Paragraph 20) The words at the park, spoken out of Plaintiff's presence, speak in general terms and not of this family alone. (Paragraph 40) On information and belief, by written policy or settled practice, the Sheriff's Office treated an owner's permission, given away from the house, as allowing deputies to go in after another adult who lived there, to stay over his objection when he came home, and to seize him at his door without a warrant. In the alternative, on information and belief, the Sheriff's Office did not teach deputies that the permission of an owner who is away does not override the objection of a resident who is present, or allow his seizure at his own door without a warrant. Calls in which deputies seek an owner's permission to go in after another adult who lives there recur in domestic cases, the need to teach this limit was obvious, and the failure to teach it was deliberate indifference. The County also had notice. Green County was a defendant in <u>Mason v. Green County</u>, No. 19-cv-83 (W.D. Wis.), which arose from a family dispute reported to the police. On March 30, 2020, this Court ruled that the deputies there were not entitled to qualified immunity, and on April 22, 2020, it granted the plaintiff summary judgment on his claim that three Green County deputies entered and searched his home without a warrant in violation of the Fourth Amendment. On information and belief, the Sheriff's Office learned of those rulings in 2020, and neither the County nor the Sheriff's Office afterward reviewed its policy or gave deputies new training on when they may go into a

home, or stay at a resident's door, without a warrant on a domestic call. This belief rests on what the deputies said and did on July 6, 2021, and on the County's control of its training records. In the alternative, on information and belief, any change made after those rulings taught deputies to get an owner's permission and did not teach the limit pleaded here. That inaction or change was deliberate indifference and the County's own act.

66. The second branch concerns the arrest. The deputies spoke of the arrest as following from the callers' fear and the domestic label. (Paragraph 10) After the arrest, at about 8:59 p.m., a deputy, on information and belief Deputy Peterson, said, in substance, that it was going to be "domestic," and that "if you're in fear of going home," Plaintiff was going to "have to get arrested anyways." (Paragraph 25) Those words, said of this arrest, describe a general way of proceeding. On information and belief, the written domestic-abuse policy of the Sheriff's Office, or its training or settled practice, directed or led deputies to arrest an adult when a person who lived with him said that she was in fear of him, whether or not the facts known to the deputy showed a crime. In the alternative, on information and belief, the Sheriff's Office did not teach deputies that a person's fear, without facts showing a crime, is not probable cause to arrest. This claim does not depend on whether the rule complied with state law. Arrests in domestic cases recur, the need to teach this limit was obvious, and the failure to teach it was deliberate indifference. Neither the plea nor the judgment addressed any policy, practice or training of the Sheriff's Office.

67. Each policy, practice or failure pleaded in this Count was in force on July 6, 2021, and was the moving force behind the seizure at Plaintiff's door or the arrest, which paragraphs 60 to 63 state were unreasonable seizures. The County's notice and its inaction or change pleaded in paragraph 65 are its own acts and do not depend on who sets policy in the Sheriff's Office. Green County

is liable for the seizure at Plaintiff's door and for the arrest. This claim began to run no earlier than February 11, 2026. (Paragraphs 40 and 41) The alternative in paragraph 59 against Defendant Kanable applies to this Count.

## THE 72-HOUR PERIOD AND THE BOND BARRED PLAINTIFF FROM HIS HOME

68. This section states no count. It states the facts of the claims that paragraph 48 reserves.

69. As the deputies applied the 72-hour period to Plaintiff, Wis. Stat. § 968.075(5)(a)1. provides that, unless there is a waiver, a person arrested for a domestic abuse incident "shall avoid the residence of the alleged victim," on pain of a fine or imprisonment and of mandatory arrest. Wis. Stat. § 968.075(5)(a)2., (e). On information and belief, no waiver was signed. The bond then barred contact with the callers "or residences," but for the one escorted trip that paragraph 37 quotes. The bar was a present restraint on where he could go, in force every day the bond stood, and, on information and belief, going to his home otherwise would have exposed him to arrest and to a new charge. It was not a duty to appear in court or to ask leave before doing something. It took from Plaintiff the right to live in, or go to, his home, and the use of what he kept there, except as the bond allowed. By the reports' own accounts the callers had left the property and there had been no physical contact. (Paragraph 13)

70. On information and belief, each deputy wrote his report knowing that it would go to the prosecutor and the court and be used in deciding what restraints to place on Plaintiff, and the judicial officer who set the bond had no account of July 6, 2021, other than the deputies'. The bond's one exception to the residence term opens, "After 72 hour No Contact expires." A bar from his home was the natural and foreseeable result of that account. After the arrest, a deputy

advised the callers to "get that TRO right away because then he can't come back." (Paragraph 27)

71. The statements in the written account that Plaintiff made a "physical movement," that he was held "[d]ue to continuous threats," and that he "used profanity that threatened both" his mother and his sister are false so far as paragraphs 34 and 35 state. A profane word is not by itself a threat or a crime. On information and belief, the deputy who wrote each statement knew that it was false or wrote it with reckless disregard of the truth. Deputy Hermanson wrote the first two, and Deputy Peterson wrote the third and read the 72-hour notice to Plaintiff's mother. (Paragraphs 27, 34 and 35) The account also left out what paragraphs 36 and 42 state. With those statements taken out and those matters put in, including that a deputy had called the matter "a simple disorderly conduct," the account states a fear and impressions, names no physical act toward either caller on July 6, 2021, beyond an approach, and quotes no words of Plaintiff threatening anyone. (Paragraphs 10, 13, 16, 34 and 35) On information and belief, on the account so corrected, no judicial officer would have barred Plaintiff from his home.

72. No statute commanded the 72-hour period here. Wis. Stat. § 968.075(5)(a)1. speaks of the 72 hours following "an arrest for a domestic abuse incident." Whether this was such an incident was decided by the County's own deputies, under the County's own label. Walking toward a person, without more, is not an act of the kind § 968.075(1)(a) lists. (Paragraph 38) A deputy called the matter "a simple disorderly conduct," and said, "the domestic is an enhancer. It's attached to it." A deputy said that the period "kind of gives you time to get your affairs in order with getting an eviction." (Paragraph 10) Neither count of the criminal complaint refers to domestic abuse. (Paragraph 39)

73. On information and belief, by written policy or settled practice, the Sheriff's Office put the domestic label and the 72-hour period on an adult when a person who lived with him said that she was in fear of him, whether or not the facts known to the deputy showed an act of the kinds § 968.075(1)(a) lists, and used them as the short-term way to keep him out of the house while civil process ran. A deputy spoke of that course in general terms, as the "domestic route." (Paragraph 10) The 72-hour period barred Plaintiff from his home with no judicial officer deciding anything, for a purpose a deputy described as time for an eviction. As the docket states it, the bond's residence term named no end, though the period in § 968.075(5)(a)1. is 72 hours, and the docket records a change on October 27, 2025. (Paragraph 37)

## RELIEF

Plaintiff asks for judgment against Defendants as follows:

A. compensatory damages in an amount to be decided by the jury, and nominal damages on each claim;

B. punitive damages against Defendants Hermanson and Peterson in their individual capacities;

C. costs, and reasonable attorney's fees under 42 U.S.C. § 1988 for any counsel who appears for Plaintiff;

D. a statement in any judgment that the claims reserved in paragraph 48 are reserved; and

E. such other relief as the Court finds just.

## JURY DEMAND

Plaintiff demands a trial by jury on every issue that may be tried to a jury.

Dated: November 10, 2026

Joseph Maxim Howden

Joseph Maxim Howden
Plaintiff, without counsel
W6130 County Road H
New Glarus, WI 53574
(847) 204-2817
maksimaleksandrovichandreev@proton.me